# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

**United States of America,**

    **Plaintiff/Respondent,**

v.                                            Case No. 07-20164-05-JWL
                                                Case No. 12-2263-JWL

**Jeremy Gilmore,**

    **Defendant/Petitioner.**

## MEMORANDUM & ORDER

In December 2007, defendant Jeremy Gilmore, along with multiple co-conspirators, was charged with conspiracy to distribute and to possess with intent to distribute more than 50 grams of methamphetamine. In May 2009, Mr. Gilmore was convicted by a jury and, thereafter, the court imposed the mandatory minimum sentence of life imprisonment in light of Mr. Gilmore's two prior convictions for felony drug offenses. *See* 21 U.S.C. § 841(b)(1)(A)(vii). The Tenth Circuit affirmed Mr. Gilmore's conviction and Mr. Gilmore then filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255. In his petition, Mr. Gilmore asserted that the performance of his counsel was deficient in a number of respects, including that his counsel failed to advise him sufficiently concerning whether to plead guilty instead of proceeding to trial. The court granted Mr. Gilmore's request for an evidentiary hearing on that claim, which it retained under advisement, appointed counsel for litigation of that claim, and dismissed the petition in all other respects.

On January 28, 2013, the court held an evidentiary hearing on the claim. Mr. Gilmore was represented by Brandon Bell and the government was represented by Assistant United

States Attorney Scott Rask. The evidence presented at the hearing focused on several key issues pertinent to Mr. Gilmore's claim, including whether his counsel failed to meaningfully communicate to him the government's plea offers; whether his counsel failed to advise him that a conviction at trial would guarantee him a life sentence in light of his two prior felony drug convictions; whether his trial counsel should have negotiated and secured a plea agreement prior to the government's filing of an information under 21 U.S.C. § 851; and whether his trial counsel lacked sufficient knowledge of the federal drug conspiracy laws such that she misinformed Mr. Gilmore about his likelihood of success at trial. As explained in more detail below, the court concludes that Mr. Gilmore received constitutionally deficient representation in each of these respects and that such representation undoubtedly prejudiced the outcome of the case. Thus, the court finds that Mr. Gilmore is entitled to relief on that portion of his § 2255 petition that it had previously retained under advisement. As to the actual remedy, the court directs Mr. Bell and Mr. Rask to meet and confer concerning an appropriate remedy for the constitutional violation that occurred. If the parties are unable to agree on an appropriate remedy (subject to the court's approval), then, consistent with the parties' requests, the court will permit the parties to submit supplemental briefing on the issue of an appropriate remedy and will schedule a hearing on the issue.

*Standard*

Title 28 U.S.C. § 2255 entitles a prisoner to relief "[i]f the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of

the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." *Id.* The remedy under § 2255, then, does not encompass all claimed errors in conviction and sentencing; rather, the claimed error must constitute a "fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Blackwell*, 127 F.3d 947, 954 (10th Cir. 1997) (quotations and citations omitted).

To obtain relief in the particular context of an ineffective assistance of counsel claim, Mr. Gilmore must establish both that his counsel's performance was deficient and that he was thereby prejudiced. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). With respect to the performance prong, Mr. Gilmore must overcome a "strong presumption that counsel's representation was within a wide range of reasonable professional assistance." *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (internal quotations omitted). To overcome that presumption, he must show that counsel "failed to act reasonably considering all the circumstances." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (internal quotations omitted). In other words, Mr. Gilmore must show that his counsel made "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *United States v. Rushin*, 642 F.3d 1299, 1307 (10th Cir. 2011) (quoting *Harrington*, 131 S. Ct. at 787).

With respect to the prejudice prong, Mr. Gilmore must "demonstrate a 'reasonable probability' that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Rushin*, 642 F.3d at 1309 (quoting *Harrington*, 131 S. Ct. at 787). A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Id.* at 1310

(quoting *Strickland*, 466 U.S. at 694). Confidence in the outcome is undermined only when "the likelihood of a different result is substantial, not just conceivable." *Id*.

*Background*

The following facts are either reflected from the docket in this case or from the testimony of witnesses at the evidentiary hearing.

As noted earlier, Mr. Gilmore was indicted in December 2007. In early January 2008, the court appointed an attorney to represent Mr. Gilmore. This attorney (hereinafter referred to as "initial counsel") testified at the evidentiary hearing concerning his representation of Mr. Gilmore—representation that, in light of a potential conflict of interest that surfaced, lasted only five or six weeks. During initial counsel's representation of Mr. Gilmore, they met on three separate occasions to discuss various aspects of Mr. Gilmore's case. As reflected in handwritten notes of initial counsel (Exh. 401), he and Mr. Gilmore, on January 14, 2008, discussed Mr. Gilmore's criminal history. Although initial counsel testified that he was made aware of only one prior felony drug conviction in Mr. Gilmore's history, counsel's meeting notes reflect a discussion of "possession of meth" in "Barry Co." and "trafficking" in "Lawrence Co.," referring, as confirmed by initial counsel, to the respective counties in which Mr. Gilmore had prior cases. Mr. Gilmore testified that he advised initial counsel about convictions in both Barry County and Lawrence County.

According to initial counsel, he received a proposed, unsolicited plea agreement via e-mail from the prosecuting attorney on January 30, 2008. The proposed plea agreement required Mr. Gilmore's cooperation in exchange for the government's agreement to request a 3-level

reduction for acceptance of responsibility and to request a reduced sentence below any statutory minimum upon a determination that Mr. Gilmore provided substantial assistance to the government. Exh. 404. Although he provided a copy of this proposed plea agreement to Mr. Gilmore (which Mr. Gilmore confirmed at the hearing), initial counsel did not discuss the proposed agreement in any detail with Mr. Gilmore based on initial counsel's belief that detailed discussions about pleading guilty too early in the process is not helpful to the building of the relationship with a client. Initial counsel testified that he and Mr. Gilmore simply never reached the point of discussing whether to proceed to trial or to negotiate a plea agreement and, in the case of entering a plea agreement, whether to pursue cooperation with the government.

The day after receiving the proposed plea agreement from the prosecutor, initial counsel prepared a sentencing memorandum for Mr. Gilmore consistent with counsel's standard practice. Exh. 402. During his testimony, Mr. Gilmore confirmed receipt of the memorandum. In that memorandum, initial counsel advised Mr. Gilmore, based on his asserted belief that Mr. Gilmore was a one-time prior drug felon, that Mr. Gilmore faced a possible statutory minimum punishment of 20 years' imprisonment with a maximum sentence of life imprisonment if he was convicted at trial or pled guilty to the conspiracy charge without an agreement to cooperate with the government. The sentencing memorandum also recognized the possibility that Mr. Gilmore could receive a sentence below the statutory minimum of 20 years if he pled guilty to the conspiracy charge and cooperated with the government. It is undisputed that this memorandum did not mention any circumstance under which Mr. Gilmore might face a mandatory minimum life sentence. Moreover, initial counsel testified that he had no recollection of discussing with

5

Mr. Gilmore at any time what the impact on the statutory minimum would be if he had more than one prior felony drug conviction.

On February 19, 2008, the court granted initial counsel's motion to withdraw and, two days later, the court appointed substitute counsel for Mr. Gilmore. Initial counsel testified that he forwarded all discovery to Mr. Gilmore's new counsel, but he had no recollection of forwarding the proposed plea agreement to new counsel. In any event, new counsel (hereinafter referred to as "trial counsel") testified that Mr. Gilmore's case was the first federal drug conspiracy case that she ever handled through trial and, at the hearing, she equivocated on whether she was "unfamiliar with federal drug conspiracy law." She conceded, however, that she was inexperienced in the process and the affidavit she submitted in support of the government's response to Mr. Gilmore's § 2255 petition indicates that in March 2008 she "brainstormed" with a more experienced criminal defense attorney "re: defending drug conspiracy cases in general." Exh. 413.

Trial counsel testified as to the steps she took to familiarize herself with the case upon her appointment beginning in late February 2008. According to trial counsel, she met with Mr. Gilmore on several occasions, researched applicable laws and reviewed the government's proffer books on at least three occasions. During one or more of her visits to the United States Attorneys' Office to review proffer books, trial counsel engaged in informal discussions with the prosecutor on the case regarding a potential plea agreement. According to trial counsel, the prosecutor told her that her client was "going to get convicted [so] you need to talk to me about working something out." Trial counsel testified that the prosecutor, to the best of her recollection, offered "something like 15 or 20 years . . . I want to say 20." The prosecutor

6

testified that she and trial counsel had several discussions over the course of trial counsel's representation and that the proposed plea agreement never varied—that Mr. Gilmore could plead guilty to the conspiracy charge and could cooperate to attempt to get below any statutory minimums.

Trial counsel's affidavit indicates that she met with Mr. Gilmore in March 2008 and that they discussed, among other things, his "knowledge of/interaction with co-defendants" and his "prior convictions." Exh. 413. Consistent with trial counsel's affidavit, Mr. Gilmore testified that he advised his trial counsel about his convictions in both Barry County and Lawrence County. Moreover, trial counsel confirmed at the hearing that her handwritten notes in late May 2008 indicate that Mr. Gilmore advised her that he had "two different cases," one in Barry County and one in Lawrence County. Exh. 406. Trial counsel testified at the hearing that, certainly no later than July 2008 she knew that Mr. Gilmore had two prior felony drug convictions.

Trial counsel testified that by July 2008 she was in a position to render legal advice to Mr. Gilmore. On July 21, 2008, trial counsel sent a letter to Mr. Gilmore enclosing a copy of the conspiracy statute under which Mr. Gilmore was charged and a copy of 21 U.S.C. 851, both without any explanation whatsoever. Exh. 407. She also attached a copy of the sentencing guidelines grid and seven pages of sentencing worksheets on which she calculated a guidelines range of 360 months to life imprisonment. Exh. 409. In her letter, trial counsel cautioned Mr. Gilmore that he is facing a "substantial amount of time" and that he should "adequately consider" the documents and "choose which option you should pursue—plea or trial." Exh. 407. On the final page of her sentencing worksheets, trial counsel, through her handwritten

notes, identified several outstanding issues that might bear on sentencing, including whether "2 prior drug felonies count as 1 in determining crim. history category?"; whether "2 prior drug felonies count separately to enhance [defendant] to career offender (which requires 2 prior drug felonies)?"; whether defendant will "get minimal/minor role adjustment?"; and "what amount/qty of drugs is [defendant] responsible for?" Exh. 409. During the hearing, trial counsel surmised that her guidelines calculations were prepared because "maybe if we worked a plea it would be relevant." She conceded, however, that nothing in the letter or the attachments references any potential for a statutory minimum sentence of life imprisonment.

At the evidentiary hearing, trial counsel testified that during this time frame, she advised Mr. Gilmore to permit her to negotiate a plea agreement because he was looking at a "hefty" sentence and that he was "looking at life" if the government filed an enhancement. According to trial counsel, she never received authorization from Mr. Gilmore to pursue a plea agreement because Mr. Gilmore steadfastly maintained his innocence—admitting that he had used drugs but was not involved in any conspiracy to distribute drugs. Mr. Gilmore, however, testified that trial counsel specifically advised him that sharing drugs and distribution of drugs "is two different things." The record also reflects trial counsel's belief that the government's case against Mr. Gilmore was not a strong one. Just prior to trial, trial counsel asked the prosecutor via e-mail whether she was "missing something" because she saw nothing "particularly damning" in the discovery or the proffer statements. Exh. 412. At the hearing, trial counsel testified to her belief that the "proffers were not very specific to Mr. Gilmore" and that she did have "some concern about whether or not they had evidence against him."

In October 2008, the government filed a § 851 notice that included both of Mr. Gilmore's convictions. As the court understood the prosecutor's testimony, it was not clear to her until near that time whether Mr. Gilmore had two prior convictions or only one prior convictions and she did not receive clarification of that issue until she received the journal entries from the state court cases. Trial counsel was asked at the evidentiary hearing whether she recalled advising Mr. Gilmore at any time after the filing of the § 851 notice until the time of trial that he would receive a life sentence in light of the enhancement if convicted at trial. In response, trial counsel stated that she did not recall a specific conversation but she knew that "the nature of our conversations was that he was looking at life." Later during her testimony, trial counsel asserted that Mr. Gilmore "was well aware if convicted at trial he was going to get life." However, in the affidavit that trial counsel submitted in support of the government's response to Mr. Gilmore's § 2255 petition, trial counsel averred that she warned Mr. Gilmore "that a conviction at trial would very likely result in a life sentence." On cross-examination, trial counsel testified that "by the time we got to trial, we knew he was looking at life for sure."

Several weeks prior to trial, the prosecutor sent an e-mail to trial counsel stating that she had a "hard time understanding why you would want to take a statutory life case to trial when there are two confessions by this defendant to two different officers, over a dozen cooperating witnesses, and a prior two week trial of the SOSs in which they were absolutely slaughtered with the jury reaching a verdict of guilty on all defendants and all charges in under two hours." Exh. 412. In that e-mail, the prosecutor cautions trial counsel that she would be sending out subpoenas the following week and beginning to meet with witnesses such that "the 3rd level for acceptance of responsibility will be unavailable." Exh. 412. In response to this e-mail, trial

counsel sent the e-mail referenced above in which she asks whether she is "missing something" because she did not see anything particularly damning about Mr. Gilmore in the discovery or in the proffer statements. Exh. 412. According to trial counsel, she understood the prosecutor's e-mail to mean that a guidelines sentence rather than a statutory mandatory minimum sentence was still available to Mr. Gilmore. Trial counsel testified at the evidentiary hearing that she continued to attempt to persuade Mr. Gilmore to permit her to negotiate a plea agreement (although she had no recollection of discussing a potential guidelines sentence with Mr. Gilmore at that point) but Mr. Gilmore continued to protest his innocence.

At the evidentiary hearing, Mr. Gilmore testified that his trial counsel never advised him that he would face a mandatory life sentence if convicted at trial and that, if he had known that a conviction carried a mandatory life sentence, he would have entered a plea to escape that life sentence. Nonetheless, Mr. Gilmore proceeded to trial and was convicted on the conspiracy charge. At trial, Mr. Gilmore testified that, on multiple occasions, he purchased methamphetamine from one of his co-defendants, whom he knew to be a drug dealer, and then shared that methamphetamine with several of his friends, co-defendants and his girlfriend. Mr. Gilmore also admitted on the stand that, on more than one occasion, he personally drove one or more of his co-defendants to Kansas City, Kansas for the purpose of purchasing methamphetamine and that he knew these co-defendants were drug dealers at the time. He testified that he assumed that his co-defendants were bringing methamphetamine back to St. Joseph, Missouri. Mr. Gilmore also testified that, on one occasion, he attempted to collect money owed to one of his co-defendants because he felt that co-defendant had sold him "bad dope" such that the money was, in fact, rightly his money.

10

*Discussion*

The court begins its analysis of the evidence with the performance prong of *Strickland*—namely, whether Mr. Gilmore has demonstrated that his counsel's performance was constitutionally deficient during pretrial plea negotiations by failing to inform him that he faced a mandatory life sentence if convicted at trial and by failing to appropriately evaluate the government's evidence in the context of the federal drug conspiracy laws. As will be explained, the court concludes, based on the evidence, that Mr. Gilmore's "counsel's performance fell below 'the range of competence demanded of attorneys in criminal cases,'" thereby establishing the first element of an ineffective assistance claim under *Strickland*. *United States v. Graham*, 91 F.3d 213, 218 (D.C. Cir. 1996) (quoting *Strickland*, 466 U.S. at 687).

From the onset of this case, Mr. Gilmore was not adequately advised about the potential ramifications of his two prior felony drug convictions. The court is persuaded that initial counsel knew as early as January 14, 2008 that Mr. Gilmore had, in all likelihood, two prior felony drug convictions that, if the government filed an enhancement, would essentially guarantee Mr. Gilmore a statutory mandatory minimum life sentence if convicted at trial. Although initial counsel testified that he believed Mr. Gilmore only had one prior conviction, his notes reflect a discussion with Mr. Gilmore of two separate cases in two separate counties. Moreover, initial counsel did not explain the basis for his belief that only one prior conviction existed despite the discussion with Mr. Gilmore of two cases in two counties and Mr. Gilmore testified that he advised initial counsel about the two separate convictions.

Despite his knowledge of at least the potential of two prior drug convictions, initial counsel, after receiving a proposed plea agreement from the prosecutor, provided a sentencing memorandum to Mr. Gilmore that did not, under any scenario, discuss the possibility of a mandatory minimum life sentence. Initial counsel testified that he had no recollection of ever discussing with Mr. Gilmore what his sentence would be if he had more than one prior felony drug conviction. Indeed, the sentencing memorandum presented three possible sentencing scenarios: (1) if Mr. Gilmore accepted the plea agreement without cooperating, he would have a sentencing guideline range of 108 to 135 months but would face a mandatory minimum sentence of 20 years; (2) if Mr. Gilmore proceeded to trial, he would have the possibility, "however slight," of an acquittal, with a worst-case scenario in the event of a conviction of the loss of an acceptance-of-responsibility reduction, with a likely sentence of at least 20 years (the mandatory minimum sentence) to a maximum of life; and (3) if Mr. Gilmore accepted the plea agreement and provided significant cooperation, he might avoid the 20-year minimum, with a best-case scenario of a sentence of 188 months. At this point, then, Mr. Gilmore believed, and rightly so, that he faced a mandatory minimum sentence of 20 years (in the absence of cooperation at least) regardless of whether he pleaded guilty or proceeded to trial.

The court is persuaded that Mr. Gilmore received constitutionally deficient representation from initial counsel by counsel's failure to advise Mr. Gilmore that his convictions could trigger a "double" bill of information under § 851 from the government which would result in a mandatory minimum life sentence. *See Graham*, 91 F.3d at 218 (government conceded that defense counsel's failure to inform client that he faced a mandatory life sentence if convicted at trial satisfied first prong of *Strickland*); *Francisco v. United States*, 2010 WL 378518, at *5

(D.R.I. Feb. 2, 2010) (counsel's failure to inform client at the time he presented a proposed plea agreement that client was facing a mandatory life sentence at trial "would likely constitute objectively deficient performance"). Of course, the deficient performance of Mr. Gilmore's initial counsel occurred early enough in the case that the errors could have been corrected by trial counsel in sufficient time to preclude any prejudice to Mr. Gilmore. Unfortunately, trial counsel not only failed to correct the errors of initial counsel but compounded those errors through her own deficient performance.

It is undisputed that trial counsel, by July 2008, knew that Mr. Gilmore had two prior felony drug convictions. Nonetheless, her July 21, 2008 letter to Mr. Gilmore clearly indicates that trial counsel did not understand the implication of those two prior drug convictions. She cautioned Mr. Gilmore that he was facing "a substantial amount" of time (she calculated a guidelines range of 360 months to life) and her handwritten notes indicate to the court that trial counsel believed that Mr. Gilmore was eligible for a guidelines sentence. Certainly, nothing in the letter or the attachments notifies Mr. Gilmore of any possibility of a mandatory minimum life sentence.

The court is also convinced that, during this same time frame, trial counsel's understanding of federal drug conspiracy laws and her assessment of the evidence against Mr. Gilmore were entirely inaccurate. The court is persuaded that trial counsel led Mr. Gilmore to believe that his chances of securing an acquittal were higher than the law would support under the facts of the case and that Mr. Gilmore's protestations of his "innocence" were informed by trial counsel's advice. Specifically, trial counsel advised Mr. Gilmore that "sharing" drugs did not mean "distributing" drugs. Mr. Gilmore testified that trial counsel gave him that advice and

13

that testimony is corroborated by trial counsel's own arguments during the instruction conference at trial. While that legal question is apparently an open one in the Tenth Circuit, *see United States v. Gilmore*, 438 Fed. Appx. 654, 660 (10th Cir. 2011) (the question of whether and when "sharing" of drugs constitutes their distribution remains unresolved in the Circuit), trial counsel's advice to Mr. Gilmore that the two concepts were, in fact, different is not the law of the Circuit. Nonetheless, Mr. Gilmore, presumably with the go-ahead from trial counsel, testified at length at trial about purchasing methamphetamine from a known drug dealer and sharing those drugs with his co-defendants, his friends and his girlfriend on numerous occasions.

Mr. Gilmore also testified that he drove one or more of his co-defendants to Kansas City, Kansas for the purpose of purchasing methamphetamine, that he knew his co-defendants were drug dealers at the time, and that he assumed his co-defendants were bringing methamphetamine back to St. Joseph, Missouri. Mr. Gilmore's decision to testify without hesitation about such matters indicates a belief that his level of involvement with his co-defendants did not constitute a violation of federal drug conspiracy laws—a belief that the court is convinced was informed by trial counsel. Trial counsel reviewed the proffer statements on numerous occasions and did not see anything "particularly damning" about Mr. Gilmore. She asked the prosecutor if she was "missing something." Trial counsel admitted at the evidentiary hearing that she had "some concern about whether or not they had evidence against him."

In sum, trial counsel's failure to understand and communicate to Mr. Gilmore the sentencing implications of his two prior felony drug convictions, coupled with trial counsel's misunderstanding of federal drug conspiracy laws, deprived Mr. Gilmore of the opportunity to make a knowing and intelligent decision about whether to accept the government's standing plea

14

offer. *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012) (criminal defendant is entitled to competent advice of counsel in plea negotiations). The court is similarly persuaded that Mr. Gilmore's continued protestations of innocence and his decision to proceed to trial were undoubtedly informed by the affirmative misadvice he received from trial counsel. For the foregoing reasons, the court concludes that Mr. Gilmore's counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment.

The next question, then, is whether that deficient performance prejudiced Mr. Gilmore in the sense that it can be said that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. To establish prejudice in the context of a decision to reject a plea and proceed to trial, Mr. Gilmore must establish "a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler v. Cooper*, 132 S. Ct. 1376, 1385 (2012).

After carefully considering the evidence presented at the hearing, the court concludes that Mr. Gilmore has established the requisite prejudice in two respects. First, the court is persuaded that Mr. Gilmore, with the advice and guidance of competent counsel, would likely have obtained a plea agreement in the summer of 2008—prior to the filing of the § 851 notice—that would have contemplated either a 20-year mandatory minimum sentence or, at worst, a mandatory minimum life sentence, but in either case with the opportunity for a reduced sentence

15

under § 3553(e) for substantial assistance. Second, the court is persuaded that Mr. Gilmore, again with the advice and guidance of competent counsel, would likely have obtained a plea agreement just prior to trial that, while incorporating the mandatory minimum life sentence triggered by the § 851 notice, would have provided Mr. Gilmore an opportunity to nonetheless get out from under that statutory minimum through substantial assistance.

The court begins by focusing on the summer of 2008—a critical time period with respect to potential plea negotiations. By July 2008, trial counsel knew that Mr. Gilmore had two prior felony drug convictions. Significantly, the government does not appear to have known at that time whether Mr. Gilmore had two convictions or only one conviction and it had not filed any enhancements. With a proper assessment of the evidence against Mr. Gilmore viewed through the lens of federal drug conspiracy law, and an understanding of the ramifications of the two prior convictions, competent trial counsel would have counseled Mr. Gilmore to accept a plea agreement and, in turn, would have attempted to secure an agreement from the government that it could file a single § 851 notice based on the one conviction (the prosecutor testified that she absolutely would have filed the § 851 prior to the entry of any plea) but would refrain from filing a second § 851 notice regardless of what it discovered.

While the prosecutor testified that she never agrees to dismissing an § 851 as part of a plea agreement, the Assistant United States Attorney representing the government at the evidentiary hearing, who at the time in question had supervisory responsibility over criminal matters in the office prosecuting this case, candidly admitted to the court that in drug conspiracy cases involving a low-level participant like Mr. Gilmore, it was very plausible that the government would be willing to bargain away a second § 851 notice in order to secure a 20-year

16

mandatory minimum sentence in the very early stages of the case. Indeed, counsel for the government admitted that he has engaged in those very negotiations himself and that the office "absolutely" considers in the bargaining process the defendant's degree of culpability and that, in the summer of 2008, this case could have been resolved short of Mr. Gilmore agreeing to a life sentence. In the court's own experience, it is not out of the question for the government to agree not to file an additional § 851 in circumstances not unlike the circumstances presented here. But, even if the government would not have been willing to bargain away the second § 851 notice, had Mr. Gilmore been counseled properly he most certainly would have been able to accept an offer no worse than the one tendered to initial counsel, one which would have provided an avenue to avoid a life sentence by cooperating.

Mr. Gilmore testified that if his trial counsel had advised him about the sentencing ramifications of his two prior convictions, he would have entered a plea to escape that life sentence. Regardless of whether he could have avoided a second § 851 enhancement, he would have been in a position to avoid a life sentence had he been represented effectively. Thus, it is reasonably probable that Mr. Gilmore would have ended up with a sentence less severe than the life sentence ultimately imposed. While the government asserts that any notion of Mr. Gilmore accepting a plea defies belief in light of his continued and insistent protestations of his innocence, the court is convinced that Mr. Gilmore's steadfastness on that issue was informed by his counsel's misadvice on both the nature and weight of the evidence against Mr. Gilmore and the substance of federal drug conspiracy laws. That advice significantly undermined Mr. Gilmore's ability to make a knowing decision about whether to accept a plea.

Moreover, the court finds it reasonably probable that Mr. Gilmore and the government would have entered a cooperation agreement in April 2009 if Mr. Gilmore had been represented by constitutionally effective counsel at that time. Of course, by that time, the government had filed the § 851 notice with respect to both convictions such that the mandatory minimum life sentence had already been triggered. Nonetheless, the prosecutor's April 2009 e-mail to trial counsel clearly demonstrates that the government was still willing to negotiate a cooperation agreement with Mr. Gilmore and that the government contemplated that Mr. Gilmore, with cooperation, would have been able to get out from under the mandatory life sentence. There is simply no reason to discuss a reduction for acceptance of responsibility unless the mandatory minimum might not apply. The mandatory minimum, of course, would only be inapplicable if Mr. Gilmore cooperated and the government filed a § 3553(e) or if the government withdrew the § 851 notice. Because the court is not persuaded that the government would have agreed to withdraw that notice, the prosecutor's reference to acceptance of responsibility must indicate that she anticipated Mr. Gilmore's cooperation and the subsequent filing of a § 3553(e) motion. The court is also persuaded that Mr. Gilmore would have accepted a cooperation agreement—the evidence reflects that the government's standing plea agreement always contemplated Mr. Gilmore's cooperation and, when asked whether he would have accepted a plea if his lawyer had provided competent advice, Mr. Gilmore testified that he would have accepted a plea. Because the only plea agreement that was ever proposed was a cooperation agreement, the court construes Mr. Gilmore's testimony reflects his willingness to cooperate under the agreement. Moreover, the prosecutor testified that if Mr. Gilmore was going to enter a plea, she believed "he would do so with cooperation." And while it is impossible to say at this juncture what the

nature and scope of Mr. Gilmore's cooperation might have been (or how useful that information might have been to the government), the court is nonetheless persuaded that a reasonable probability exists that Mr. Gilmore's ultimate sentence would have been less severe than a life sentence.

For the foregoing reasons, the court finds that Mr. Gilmore has demonstrated both that his counsel's performance was constitutionally deficient and that that performance prejudiced Mr. Gilmore. In terms of an appropriate remedy for the Sixth Amendment violation, the court believes it will be useful to first have Mr. Bell and Mr. Rask meet and confer about an appropriate remedy to see whether the parties can resolve the issue, subject to the court's approval. Toward that end, Mr. Bell and Mr. Rask are directed to meet and confer about an appropriate remedy for Mr. Gilmore no later than Friday, February 15, 2013. If the parties are unable to resolve the issue, then the court, as it indicated at the hearing with the agreement of the parties, will ask the parties to submit briefing on that issue. Mr. Gilmore shall file his submission no later than March 4, 2013. The government shall file its response no later than March 25, 2013. Mr. Gilmore may file a reply no later than April 1, 2013. The court will conduct a hearing on April 15, 2013 at 1:30p.m. The court is willing to extend these deadlines upon notification from the parties that they are working toward an agreement concerning a remedy for Mr. Gilmore.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the portion of Mr. Gilmore's motion to vacate under 28 U.S.C. § 2255 (doc. 388) that the court previously retained under advisement is now **granted to the extent set out herein.**

19

**IT IS FURTHER ORDERED BY THE COURT THAT** Mr. Bell and Mr. Rask shall meet and confer concerning an appropriate remedy no later than February 15, 2013 and, if no agreement is reached, the parties shall submit additional briefing and a hearing will be set on the schedule set forth above.

**IT IS SO ORDERED.**

Dated this 4th day of February, 2013, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge
